UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

JOHN SOHEI AKAGI,

                             Plaintiff,

                 v.

TURIN HOUSING DEVELOPMENT FUND
CO., INC., *et al.*,

                       Defendants.

------------------------------------------------------X

13 Civ. 5258 (KPF)

OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  March 22, 2017

KATHERINE POLK FAILLA, District Judge:

In 2013, Plaintiff John Sohei Akagi brought this housing-discrimination lawsuit, claiming that he had been denied the opportunity to purchase an apartment because of his race.  Plaintiff named several entities and individuals as defendants, and those defendants fall into two groups: (i) Turin Housing Development Fund, Co., Inc. ("Turin"), the housing co-operative that owns the building where the apartment in question is located, and several past and present members of Turin's co-op board[1] (together with Turin, the "Turin Defendants"); and (ii) Turin's managing agent, Douglas Elliman, LLC a/k/a Douglas Elliman Property Management ("DE"), former DE employee Dorothy Kern, and current DE employee Lawrence Vitelli (together with DE, the "DE

---

[1]     The Turin board members named as defendants are: Richard J. Thomas, Harvey Minsky, Ellen Durant, Martha Miller, Linda Burstion, Angela Faison-Strobe, Jacqueline Seidenberg, Evelyn Rivera, and Veronica Jimenez.

Defendants"). After extensive discovery and failed settlement efforts, the parties have filed cross-motions for summary judgment.

This Opinion, however, does not resolve the parties' summary-judgment motions on their merits. Rather, it addresses an issue that arose only after summary-judgment briefing concluded: Plaintiff's motion to disqualify the Turin Defendants' counsel, Adam Leitman Bailey, P.C. ("ALB").

For the balance of this litigation, the Turin Defendants and the DE Defendants shared counsel. At first, they jointly retained the law firm Schneider Mitola LLP ("Schneider Mitola"). On May 30, 2014, this Court granted the Turin Defendants and DE Defendants' motion to substitute ALB in place of Schneider Mitola. And ALB continued to represent the Turin Defendants and the DE Defendants up until last summer, when it filed summary-judgment briefs on behalf of both groups of defendants.

But on July 21, 2016, Turin, represented by ALB, sued DE in New York State Supreme Court, alleging that DE negligently mismanaged Turin's property and failed to obtain insurance to cover Turin's legal costs in the instant case. The Court learned about Turin's state-court suit against DE (the "State-Court Action") on July 29, 2016, when Plaintiff moved to disqualify ALB from representing *any* defendant in this case. On September 9, 2016, ALB, on behalf of the Turin Defendants, submitted a memorandum in opposition to Plaintiff's motion to disqualify and simultaneously moved to withdraw as the DE Defendants' counsel. After the Court granted ALB's withdrawal motion, the

DE Defendants retained new counsel and joined in Plaintiff's motion to disqualify.

By suing DE on Turin's behalf, Plaintiff and the DE Defendants argue, ALB has conflicted itself out of this lawsuit.  ALB retorts that the DE Defendants waived their right to object to this very contingency when they executed a Joint Defense Agreement (the "JDA") with Schneider Mitola in 2013.

Plaintiff and the DE Defendants have the better arguments.  Between July and September 2016, ALB simultaneously represented and sued the same client: DE.  And because ALB did not cure this concurrent-representation conflict by obtaining DE's prior informed consent, ALB cannot represent the DE Defendants *or* the Turin Defendants in this case.  Accordingly, and for the reasons set forth below, the Court grants Plaintiff's motion to disqualify ALB.

## BACKGROUND[2]

Although the Court will provide a comprehensive overview of the law governing attorney disqualifications *infra*, one tenet bears mention at the outset:  Resolving a disqualification motion requires a "painstaking analysis of the facts" of a case.  *HLP Props., LLC* v. *Consol. Edison Co. of N.Y.*, No. 14 Civ. 1383 (LGS), 2014 WL 5285926, at *5 (S.D.N.Y. Oct. 16, 2014) (quoting *Fund of Funds, Ltd.* v. *Arthur Andersen & Co.,* 567 F.2d 225, 227 (2d Cir. 1977)).

With that principle in mind, the Court approaches this part of the Opinion in two sections.  First, the Court will recount the facts relevant to

---

[2]     This Opinion draws on facts from Plaintiff's First Amended Complaint ("FAC" (Dkt. #16)); the Turin Defendants and DE Defendants' Answer ("Answer" (Dkt. #118)); the Turin Defendants and DE Defendants' Response to Plaintiff's Local Rule 56.1 Statement

Plaintiff's disqualification motion.  The Court will begin by considering the claims Plaintiff raised in his September 30, 2013 First Amended Complaint (the "FAC"), the operative complaint in this case (the "Federal Action").  The Court will then review the terms of the JDA into which Turin, the DE Defendants, and Schneider Mitola entered.  Next, the Court will explain how ALB came to represent both the Turin Defendants and the DE Defendants, and review the submissions the parties filed after ALB became involved in this case.  And finally, the Court will describe the complaint ALB filed against DE in the State-Court Action (the "State-Court Complaint"), which triggered Plaintiff's disqualification motion.

Second, the Court will review the procedural history of the disqualification motion.  The Court will focus on the arguments that the parties have raised in their briefs, and also address ALB's motion to withdraw as the DE Defendants' counsel.

---

of Additional Facts, which was submitted in connection with the pending summary-judgment motions ("Def. 56.1 Resp." (Dkt. #201)); the Declaration of Mark H. Bierman in support of Plaintiff's motion for disqualification ("Bierman Decl." (Dkt. #209)) and the exhibits attached thereto ("Bierman Decl., Ex [ ]"); and the Declaration of William J. Geller in Opposition to Plaintiff's Motion to Disqualify Adam Leitman Bailey, P.C. ("Geller Decl." (Dkt. #215)) and the exhibits attached thereto ("Geller Decl., Ex [ ]").  For ease of reference, the Court refers to Plaintiff's brief in support of his motion to disqualify as "Pl. Br." (Dkt. #210); to the Turin Defendants' opposition brief as "Turin Opp." (Dkt. #214); to Plaintiff's reply brief as "Pl. Reply" (Dkt. #222); and to the DE Defendants' reply brief in support of Plaintiff's motion to disqualify as "DE Br." (Dkt. #228).

A.    **Factual Background**

1.    **Plaintiff's Claims in the FAC**

On July 29, 2013, Plaintiff brought his initial Complaint against the Turin Defendants and the DE Defendants.  (Dkt. #1).  Plaintiff also named Emmet Wechsler — the owner of the apartment Plaintiff wished to purchase — as a Nominal Defendant.  (*Id.*).  On September 26, 2013, Schneider Mitola entered a notice of appearance on behalf of the Turin Defendants and the DE Defendants.  (Dkt. #9).  And on September 30, 2013, Plaintiff filed his FAC, the operative complaint in this case.  (Dkt. #16).

In the FAC, Plaintiff alleged the following:  Turin is a housing cooperative that owns a 188-residential-unit apartment building on the Upper West Side of New York City (the "Property").  (FAC ¶ 9).  Since 1997, DE has managed the Property.  (*Id.* at ¶ 10).[3]

To develop the Property, Turin obtained loans from the federal government pursuant to Section 221(d)(3) of the National Housing Act, 12 U.S.C. § 1715*l* (d)(3).  (FAC ¶ 9).  Construction of the Property concluded in 1972, and in that year Turin began selling cooperative shares "allocated to apartments in the" Property.  (*Id.* at ¶ 25).  Because it constructed the Property with proceeds of a 40-year federal-government mortgage, Turin "was subject to the regulatory oversight of the United States Department of Housing and Urban Development ('HUD')" between 1972 and 2012.  (*Id.* at ¶¶ 24-26).  On March

---

[3]    For clarity's sake, the Court notes that DE ceased managing the Property in 2014 (at least according to the Turin Defendants and DE Defendants' representations in their summary-judgment submissions).  (Def. 56.1 Resp. ¶¶ 253-54).

29, 2012, Turin satisfied fully its mortgage obligations, at which point it "was formally released by HUD from all federal regulatory oversight and statutory obligations." (*Id.* at ¶ 26).

When Turin first offered its apartments for sale in 1972, "four families ... of Asian Ancestry" purchased apartments. (FAC ¶ 34). But at the time Plaintiff filed the FAC, just two of the Property's 188 apartments were "owned by persons of Asian ancestry." (*Id.*). Moreover, Plaintiff alleged, "there ha[d] been no transfers or resales of [apartments] at the [Property] to individuals or families of Asian or Japanese ancestry or descent since [Turin's] creation in 1972 other than to members or relatives of the original Asian families" who purchased apartments in the Property. (*Id.* at ¶ 35).

This trend, Plaintiff alleged, was not an accident, but rather was the product of Turin's stated preference for increasing the number of Caucasian residents of the Property while simultaneously decreasing "the number of shareholders of Asian and Japanese descent and ancestry." (FAC ¶¶ 37-39). Turin's co-op board members (i.e., the Turin Defendants apart from Turin itself) perpetuated this discrimination through "racist policies, practices, procedures[,] and rules." (*Id.* at ¶ 40). And DE, Plaintiff alleged, was complicit in this discrimination: Among other alleged misdeeds, DE marketed and sold Property apartments in a way that maintained a "*de minimis* percentage of persons of Asian and Japanese descent." (*Id.* at ¶¶ 44, 53, 57-58, 62-69).

Plaintiff additionally alleged that the Turin Defendants and DE Defendants' discrimination violated federal housing laws. As a condition of

6

receiving a mortgage from the federal government, Turin was bound to follow the Fair Housing Act and the National Housing Act for the mortgage's term (1972 through 2012).  (FAC ¶ 45).  And those statutes required Turin to "carry out an affirmative program to attract buyers or tenants … of all minority and majority groups," and to ensure that diversity by "maintain[ing] an affirmative marketing program … throughout the life of the mortgage." (*Id.*).  But the Turin Defendants and DE Defendants failed to follow these housing laws.  (*Id.* at ¶¶ 47-48).  Worse still, "they adopted rules, practices, and/or procedures" in order "to avoid and circumvent … statutory and regulatory requirements." (*Id.* at ¶ 49).

Plaintiff, an elderly man "of Asian and Japanese descent and ancestry," (FAC ¶ 8), alleged that he fell victim to the Turin Defendants and DE Defendants' discrimination.  In 2012, Plaintiff wished to purchase Apartment 6-I of the Property from Wechsler.  (*Id.* at ¶¶ 74-75).  The Turin Defendants and DE Defendants, however, forbade Wechsler from transferring his cooperative shares in Apartment 6-I to Plaintiff.  (*Id.* at ¶ 79).  And the various "grounds" that the Turin Defendants and DE Defendants advanced for refusing the sale were just "pretexts to try to mask their unlawful discriminatory purposes." (*Id.* at ¶ 81).  Their goal, Plaintiff alleged, was to ensure that Apartment 6-I would not be sold to an individual "of Japanese or Asian descent and ancestry." (*Id.* at ¶¶ 87-91).

Plaintiff brought seven causes of action in the FAC, and it appears that he brought all of them against both the Turin Defendants and the DE

Defendants.  (FAC ¶¶ 99-150).  Plaintiff sought recovery under several federal

housing and civil-rights statutes: the Fair Housing Act, 42 U.S.C. §§ 3601-

3619 (Count One); 42 U.S.C. §§ 1981 and/or 1982 (Count Two); 42 U.S.C.

§ 1985 (Count Three); and 42 U.S.C. § 1986 (Count Four).  (*Id.* ¶¶ at 99-129).

Plaintiff's remaining claims (Counts Five, Six, and Seven) arose under state or

local law.  (*Id.* at ¶¶ 130-50).

### 2. The Turin Defendants and DE Defendants' JDA with Schneider Mitola

On September 26, 2013, Schneider Mitola entered a notice of appearance

on behalf of the Turin Defendants and the DE Defendants.  (Dkt. #9).  Between

September and October 2013 (the parties executed multiple counterparts),

Schneider Mitola, Turin, and the DE Defendants entered into the JDA.  (Geller

Decl., Ex. 1).[4]  Because the JDA anchors ALB's argument that it should *not* be

disqualified in the Federal Action, the Court will review with great care the

JDA's terms.  And in particular, the Court will scrutinize three types of

provisions in the JDA: (i) the JDA's provision outlining how the parties would

---

[4]     Two Douglas Elliman-affiliated entities — "Douglas Elliman, LLC" and "Residential
        Management Group, LLC d/b/a Douglas Elliman Property Management" — signed the
        JDA.  (Geller Decl., Ex. 1 at 1).  Only the second of these entities (which the Court refers
        to as "DE" throughout this Opinion) is a party to the Federal Action; the Court assumes
        that it operates under the aegis of the first entity.  And like the Court in this Opinion,
        the JDA uses the term "DE Defendants," although in the JDA the term encompasses (i)
        Kern, (ii) Vitelli, (iii) DE, *and* (iv) Douglas Elliman, LLC.  (*Id.*).

        Many entities that are involved — peripherally or directly — with the Federal Action
        have names that contain the words "Douglas Elliman."  Because untangling this
        particular web is not necessary for the disposition of this Opinion, the Court notes only
        that "DE" is: (i) a named defendant in the Federal Action; (ii) a signatory to the JDA; and
        (iii) a defendant in the State-Court Action.

split the costs of litigating the Federal Action; (ii) the JDA's provisions about sharing confidential information; and (iii) the JDA's conflicts waiver.

By its terms, the JDA "memorialize[d] [an] understanding" between Turin, Schneider Mitola, and the DE Defendants; although the President of Turin's Board of Directors executed the JDA, the JDA does not appear to have bound any of the Turin Defendants other than Turin itself. (Geller Decl., Ex. 1 at 1, 12). However, the JDA provides that Schneider Mitola would serve as counsel for Turin "and other Defendants therein," and the Court assumes that these "other Defendants" are the individual Turin Defendants. (*Id.* at ¶ 1).

Pursuant to the JDA, Turin and the DE Defendants agreed that Schneider Mitola would represent both groups of defendants, with Turin covering the totality of the legal costs "on the condition that the DE Defendants … provide all reasonable and customary assistance and cooperation to [Turin] in connection with the [Federal Action]." (Geller Decl., Ex. 1 at ¶ 1). However, the parties agreed that Turin would not "indemnify, defend[,] and hold harmless the DE Defendants if it is determined, after the exhaustion of all appellate rights, that the DE Defendants acted in a grossly negligent manner or perpetrated willful misconduct with respect to the issues raised in the" Federal Action. (*Id.* at ¶ 2).

The parties also agreed that they could, but would not be required to, share confidential information. A section of the JDA titled "Treatment of Shared Confidential, Privileged[,] or Protected Information" provided:

> Each Party, in its sole discretion, may provide confidential, privileged or other protected information to

9

> the other Parties to this Agreement which the providing
> Party believes will further the joint and common efforts
> in the [Federal Action].  This Agreement permits, but
> does not require, the Parties' outside counsel to share
> any information.

(Geller Decl., Ex. 1, ¶ 3).  The record in this case does not suggest that either

Turin or the DE Defendants ever retained "outside counsel" beyond Schneider

Mitola, ALB, and the DE Defendants' current attorney.

Subsequent provisions of the JDA added additional terms and conditions

to this confidentiality provision.  Turin and the DE Defendants agreed, for

example,

> that all past and future information and
> communications which are confidential, privileged or
> protected as to any Party will be held in confidence by
> all other Parties (unless that information ceases to be
> confidential through no violation of this Agreement),
> and will remain privileged or protected when
> communicated among the Parties.

(Geller Decl., Ex. 1, ¶ 3(a)).  But the following provision added an important

caveat to this confidentiality protection:

> The Parties agree that all information provided by one
> Party to any other Party may be used by counsel for
> such other Party solely in connection with the [Federal
> Action] unless such information being provided by any
> DE Defendant is the property of [Turin] or was obtained
> by any DE Defendant during [DE's] management of
> [Turin] and is regarding [Turin] affairs in which event
> [Turin] may direct how the document may be utilized or
> otherwise[.]

(*Id.* at ¶ 3(b)).

Finally, the JDA contained a "Waiver of Conflicts" provision, which

stated:

> In the event of any litigation or other dispute between
> or among the Parties, each Party hereby waives any
> claim that counsel for any other Party is or should be
> disqualified from representing any other Party by
> reason of receipt of confidential, privileged or protected
> information or documents pursuant to this Agreement
> or any work performed or representation in furtherance
> of this Agreement.

(Geller Decl., Ex. 1, ¶ 5). Like the JDA's provision concerning confidential information, its conflicts waiver was followed by several sub-paragraphs. Turin and the DE Defendants acknowledged "that there could be a potential or actual conflict of interest arising out of [Schneider Mitola's] representation of [Turin] and the DE Defendants," but agreed that as of the date of signing the JDA, no such "potential or actual conflict of interest" existed in the Federal Action and "the Parties' interest[s] [were] ... fully aligned." (*Id.* at ¶ 5(a)). Turin and the DE Defendants further agreed "that the potential conflict ha[d] been explained to them, that they underst[ood] such potential conflicts, and that to the extent such conflicts [were] waivable, they [were] waived." (*Id.* at ¶ 5(b)). Importantly, the JDA provides no explanation of what this "potential conflict" (or "potential conflicts") might be.

But the provision of the JDA that bears most directly on Plaintiff's disqualification motion planned for a different contingency: What would Schneider Mitola do if a *non-waivable* conflict arose? Turin and the DE Defendants agreed that

> [i]n the event that an actual non-waivable conflict arises
> as between any of the Parties represented by [Schneider
> Mitola] which would render it inappropriate for
> [Schneider Mitola] to continue as counsel for all the
> Parties or if such conflict could be resolved by one or

11

> more of the Parties obtaining separate counsel, the DE
> Defendants agree that the DE Defendants will obtain
> new counsel, at [Turin's] expense (subject to [Turin's]
> right to make a good faith claim, that based on the facts,
> [Turin] is not obligated to pay the expense of counsel for
> the DE Defendants), and [Schneider Mitola] may
> continue to represent all of the other Defendants named
> in the litigation (other than the DE Defendants).

(Geller Decl., Ex. 1, ¶ 5(c)).  Nothing in the JDA defined what type of "non-waivable conflict" could trigger this provision.  But the following sub-paragraph provided that Schneider Mitola would not advocate a position in the Federal Action that was adverse to either Turin or the DE Defendants:

> It is further agreed by the Parties that, with respect to
> any issue that may arise in the [Federal Action] which
> you disagree and/or which one of you may wish to
> pursue a course that benefits one but is detrimental to
> the interest of the other, [Schneider Mitola] cannot
> advise or assist any of you in pursuing such course and
> cannot advocate for any Parties' separate interest at the
> expense of the other Parties as long as [Schneider
> Mitola] is representing you.

(*Id.* at ¶ 5(d)).

Finally, the JDA's conflicts waiver contained provisos about Turin and the DE Defendants exchanging confidential information.  And unlike the earlier, more permissive terms of the JDA, these provisos *obligated* the parties to exchange confidential information.  One sub-paragraph confirmed that the parties would "be required to share confidential information … for the common purpose and benefit of the defense in the [Federal Action] and any and all third-party claims by the Parties to [the JDA] against any others responsible for damage alleged in the [Federal Action]."  (Geller Decl., Ex. 1, ¶ 5(e)).  And it added that Schneider Mitola "owe[d] an equal duty of loyalty and

12

communication with each" party to the JDA, which required Schneider Mitola
to "share all relevant information as it pertain[ed] to the [Federal Action]" and
forbade Schneider Mitola from "withhold[ing] relevant information from" any
party at any other party's request.  (*Id.*).

By October 17, 2013, Schneider Mitola, Turin, and the DE Defendants
had all signed the JDA.  (Geller Decl., Ex. 1 at 9-12).

### 3.    ALB's Representation of the "Turin Defendants" and the Parties' Subsequent Submissions

On April 14, 2014, ALB filed a "Consent to Change Attorneys" form on
behalf of the Turin Defendants and the DE Defendants.  (Dkt. #52).[5]  The form
provided that both groups of defendants wished to substitute ALB in place of
Schneider Mitola.  (*Id.*).  On April 29, 2014, ALB (on the Turin Defendants and
DE Defendants' behalf) filed a letter announcing its intention to move to
disqualify Plaintiff's counsel and counsel for Wechsler (who was still a Nominal
Defendant at that point).  (Dkt. #57).

The Court held a pre-motion conference on the Turin Defendants and DE
Defendants' motion to disqualify on May 30, 2014.  (Dkt. #72).  At this
conference, the Court formally substituted ALB in place of Schneider Mitola as
counsel for both groups of defendants.  (*Id.* at 18-19).  Following extensive
briefing (*see* Dkt. #78-82, 86-90, 94-98, 100-01, 103-06), the Court denied the

---

[5]    This Consent to Change Attorneys form contains a handwritten notation that refers
collectively to the Turin Defendants and the DE Defendants as "Turin Defendants."
(Dkt. #52).  Although ALB repeated this confusing nomenclature in subsequent filings
(*see* Dkt. #57), as this case progressed the parties all used the terms "DE Defendants"
and "Turin Defendants" to refer to the two groups of defendants in this case.

motion to disqualify in an Order dated February 10, 2015 (Dkt. #115). That same Order terminated Wechsler as a party to the Federal Action. (*Id.*).

On March 10, 2015, the Turin Defendants and ALB Defendants filed their Answer to the First Amended Complaint. (Dkt. #118). They denied flatly all seven causes of action Plaintiff brought in the FAC. (*Id.* at ¶¶ 99-150).

Apart from Plaintiff's disqualification motion, the latest round of briefs in this case concerned the parties' cross-motions for summary judgment. On April 6, 2016, the Turin Defendants and DE Defendants moved for summary judgment dismissing all seven of Plaintiff's claims. (Dkt. #166). Plaintiff cross-moved on May 13, 2016, seeking a converse ruling — summary judgment in favor of his claims. (Dkt. #183). The Turin Defendants and DE Defendants filed their reply on June 25, 2016 (Dkt. #200), and briefing concluded when Plaintiff submitted his reply on July 13, 2016 (Dkt. #207).

### 4.     Turin's State-Court Complaint Against DE

On July 21, 2016, Turin, represented by ALB, sued DE, several related Douglas Elliman entities, and Douglas Elliman employee Debora Hassell-Dobies (together, the "DE State-Court Defendants") in New York State Supreme Court. (Bierman Decl., Ex. D).[6] Turin raises a number of clams in its State-Court Complaint, including claims that arise out of the Federal Action.

The thrust of Turin's State-Court Complaint is that the DE State-Court Defendants "[i]ntentionally, knowingly, recklessly and/or negligently

---

[6]     Apart from DE, the "Douglas Elliman" entities named in Turin's state-court complaint are: "Douglas Elliman LLC" and "Douglas Elliman Realty LLC." (Bierman Decl., Ex. 4).

mismanage[ed] the Property." (Bierman Decl., Ex. 4, ¶ 3(a)).  The State-Court Complaint's allegations are wide-ranging, and they make specific reference to two other lawsuits involving Turin.

The first of these suits, *Turin HDFC* v. *Suarez*, No. 82366/2012, is a landlord-tenant suit ostensibly triggered by "[Hassell-]Dobie's flagrant criminal conduct." (Bierman Decl., Ex. 4, ¶¶ 2, 25).  The State-Court Complaint provides an inchoate account of that case, but by Turin's retelling the DE State-Court Defendants forcibly (and wrongfully) evicted Suarez from the Property for nonpayment of rent.  (*Id.* at ¶¶ 25-35).  At the time Turin filed the State-Court Complaint, the court hearing *Suarez* had scheduled a sanctions hearing to address Hassell-Dobies' role in that wrongful eviction.  (*Id.* at ¶ 37).  Compounding Turin's troubles, Suarez filed a wrongful-eviction suit against Turin: *Suarez, et al.* v. *Turin HDFC, et al.*, No. 15037/2014.  (*Id.* at ¶ 40).  Although Turin had insurance to cover its costs in Suarez's wrongful-eviction suit, it alleges that the DE State-Court Defendants' failure to obtain additional insurance for Turin left it "without coverage" for the sanctions hearing in the underlying *Suarez* case.  (*Id.* at ¶ 42).

The second suit the State-Court Complaint addresses is the Federal Action.  (Bierman Decl., Ex. 4, ¶¶ 4, 44).  Here too, Turin alleges that the DE State-Court Defendants' failure to procure adequate insurance coverage had exposed Turin and its Board members to liability "for any future judgment … entered against them." (*Id.* at ¶ 4).  Further, Turin alleges that the

DE State-Court Defendants failed to obtain insurance coverage for Turin's legal costs in the Federal Action.  (*Id.* at ¶ 46).

The State-Court Complaint also addresses a different brand of the DE Defendants' alleged negligence related to the Federal Action.  Turin states that in the Federal Action, Plaintiff had "allege[d] that the [DE State-Court Defendants] failed to implement certain affirmative fair housing marketing schemes, or, that if they did implement such schemes, they did so in a negligent manner."  (*Id.* at ¶ 45).

The State-Court Complaint does not bring this negligence allegation directly.  Put another way, *Turin* does not allege in the State-Court Complaint that the DE State-Court Defendants negligently failed to obey federal housing laws.  But the State-Court Complaint does contain allegations that could conceivably encompass this particular type of negligence — Turin alleges that the DE State-Court Defendants:

> (i)    "Intentionally, knowingly, recklessly and/or negligently fail[ed] to provide routine supervision of Turin's building service employees who were charged with properly maintaining and operating the Property" (Bierman Decl., Ex. 4, ¶ 3(b));
>
> (ii)    "Intentionally, knowingly, recklessly and/or negligently staff[ed] the management team, consisting of [the DE State-Court Defendants'] principals, employees, representatives and/or agents, in connection with the maintenance of the Property" (*id.* at ¶ 3(k)); and
>
> (iii)    "[C]arried out their responsibilities to Turin negligently, and in at least certain specific instances, criminally, thereby causing Plaintiff to be saddled with exorbitant legal fees and potentially exposing Turin to large judgments, which Turin would be forced to [pay off] at its sole cost and expense" (*id.* at ¶ 63).

16

Turin's requests for damages and equitable relief also appear to address the DE State-Court Defendants' alleged misconduct in the Federal Action. In the State-Court Complaint, Turin asserts that it "is entitled to recover all of its damages, including, but not limited to, all consequential and incidental damages suffered in connection with the [*Suarez*] [s]anctions [h]earing and the Federal Action." (Bierman Decl., Ex. 4, ¶ 74). And Turin alleges that it "is entitled to a [declaratory] judgment ... that the [DE State-Court Defendants], jointly and severally, defend and indemnify Turin in connection with the [s]anctions [h]earing and Federal Action, as a consequence of the panoply of [their] wrongful acts." (*Id.* at ¶ 108).

## B.    Procedural Background

This Court learned about the State-Court Action on July 29, 2016, when Plaintiff filed his motion to disqualify ALB. (Dkt. #208). Plaintiff's counsel claims that *he* learned about the State-Court Action serendipitously, while he was attending "a compliance conference on an unrelated case." (Bierman Decl., ¶ 5).

At the time Plaintiff filed his motion to disqualify, ALB represented both the Turin Defendants and the DE Defendants in the Federal Action. In his disqualification motion, Plaintiff urged the Court to disqualify ALB from representing both groups of defendants. (Pl. Br. 2). By suing DE on Turin's behalf, Plaintiff argued, ALB concurrently represented two adverse clients. (*Id.* at 9-10). In describing the severity of this conflict, Plaintiff contended: "Turin's claims in the [State-Court Action] that DE did engage in wrongdoing in the very

17

same acts asserted by Plaintiff in the [Federal] Action conflicts with or undermines [the] DE Defendants' claims in the [Federal] Action." (*Id.* at 10). Plaintiff also argued that ALB's concurrent representation of Turin and DE violated multiple New York Rules of Professional Conduct, including Rule 1.7, which concerns concurrent representations. (*Id.* at 7-9).

On September 9, 2016, this Court received two submissions in response to Plaintiff's motion to disqualify. First, ALB moved to withdraw as counsel to the DE Defendants. (Dkt. #216). In a declaration accompanying that motion, ALB wrote that because it had sued the DE Defendants in New York state court, it could not "appropriately represent the DE Defendants" in the Federal Action without their consent. (Dkt. #216-1, ¶¶ 15-16). And because the DE Defendants (through their counsel in the State-Court Action) did not consent to the concurrent representation, New York Rule of Professional Conduct 1.7 forbade ALB from simultaneously representing the DE Defendants and the Turin Defendants in the Federal Action. (*Id.* at ¶¶ 16-18).

Second, the Turin Defendants, through ALB, filed a brief and supporting declaration opposing Plaintiff's disqualification motion. (Dkt. #214, 215). These opposition papers relied heavily on the terms of the JDA between Schneider Mitola, Turin, and the DE Defendants. (Turin Opp. 1-4; Geller Decl., ¶¶ 6, 9). The Turin Defendants argued that, in the JDA, Turin and the DE Defendants "acknowledged that conflicts could arise between the Turin Defendants and the DE Defendants, and the DE Defendants expressly agreed that should such a conflict arise, DE [would] obtain separate counsel and

Turin's counsel [could] continue to represent the Turin Defendants." (Turin Opp. 3). After substituting ALB in Schneider Mitola's place, "the DE Defendants continued to litigate under the JDA without comment or objection." (*Id.* at 4). Consequently, the Turin Defendants argued, the JDA's terms continued in full force after ALB joined the case. (*Id.*). The Turin Defendants thus urged the Court to allow ALB to continue representing them, just as the JDA contemplated. (*Id.* at 11).

On September 22, 2016, this Court issued an Order granting ALB's motion to withdraw as counsel for the DE Defendants. (Dkt. #220). That same day, Plaintiff submitted his reply brief in support of his motion to disqualify ALB. (Dkt. #222). And on October 14, 2016, the DE Defendants — then represented by new counsel — filed a motion joining in Plaintiff's disqualification motion. (Dkt. #227). The DE Defendants also submitted a supporting brief of their own, arguing that ALB suffered from a disqualifying concurrent-representation conflict that the JDA's conflicts waiver did not cure. (Dkt. #228).

## DISCUSSION

### A.    Motions to Disqualify Attorneys in the Second Circuit

"The authority of federal courts to disqualify attorneys derives from their inherent power to 'preserve the integrity of the adversary process.'" *Hempstead Video, Inc.* v. *Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (quoting *Bd. of Educ.* v. *Nyquist,* 590 F.2d 1241, 1246 (2d Cir. 1979)). Thus, "Second Circuit precedent is the 'only truly binding authority on

disqualification issues.'" *BT Holdings, LLC* v. *Vill. of Chester*, No. 15 Civ. 1986 (JCM), 2015 WL 8968360, at *3 (S.D.N.Y. Dec. 14, 2015) (quoting *HLP Props.*, 2014 WL 5285926, at *3).  And Second Circuit precedent is clear that courts should be reluctant to disqualify attorneys.  *See, e.g.*, *Muniz* v. *Re Spec Corp.*, — F. Supp. 3d —, No. 16 Civ. 2878 (BCM), 2017 WL 238482, at *4 (S.D.N.Y. Jan. 19, 2017) ("Disqualification is disfavored because it 'has an immediate adverse effect on the client by separating him from counsel of his choice,' and because motions to disqualify, 'even when made in the best of faith ... inevitably cause delay.'" (quoting *Nyquist*, 590 F.2d at 1246)).

It should thus come as no surprise that "motions to disqualify opposing counsel are subject to particularly strict scrutiny," especially given "their potential for abuse as a tactical device."  *Scantek Med., Inc.* v. *Sabella*, 693 F. Supp. 2d 235, 238 (S.D.N.Y. 2008).  Thus, a court adjudicating a motion to disqualify may "consider any tactical motivations" the movant might have, as well as any potential prejudice the non-movant "may suffer in the event their chosen counsel is disqualified."  *HLP Props.*, 2014 WL 5285926, at *5.  To this end, "federal courts," including courts in this Circuit, "generally take the view that any party to a lawsuit may raise a potential conflict."  *Muniz*, 2017 WL 238482, at *5.

Courts in the Second Circuit disqualify attorneys "only in essentially two kinds of cases: [i] where an attorney's conflict of interests ... undermines the court's confidence in the vigor of the attorney's representation of his client, or more commonly [ii] where the attorney is at least potentially in a position to

use privileged information concerning the other side through prior representation." *Cohen* v. *Strouch*, No. 10 Civ. 7828 (DLC), 2011 WL 1143067, at *1-2 (S.D.N.Y. Mar. 24, 2011) (quoting *Bobal* v. *Rensselaer Polytechnic Inst.*, 916 F.2d 759, 764-65 (2d Cir. 1990)).  And these two kinds of cases roughly match up to two types of conflicts that warrant disqualification in this Circuit: (i) concurrent-representation conflicts (when an attorney "simultaneously represent[s]" two adverse parties); and (ii) successive-representation conflicts (when an attorney represents a client whose interests are adverse to those of a "former client").  *Hempstead*, 409 F.3d at 133.  The Court will explore the distinction between these two types of disqualifying conflicts *infra*.

In any case, a court should disqualify an attorney "only if '[his] conduct tends to taint the underlying trial.'"  *GSI Commerce Sols., Inc.* v. *BabyCenter, L.L.C.*, 618 F.3d 204, 209 (2d Cir. 2010) (quoting *Nyquist*, 590 F.2d at 1246).[7] "Consequently, '[t]he appearance of impropriety alone does not warrant disqualification.'"  *Rothberg* v. *Phil's Main Roofing, LLC*, No. 14 Civ. 10195 (NSR),

---

[7]     At least one Judge in this District has suggested that whether an attorney's conflict of interest will cause "trial taint" is not relevant where that conflict is based on the attorney's *concurrent* representation of adverse clients.  *JPMorgan Chase Bank ex rel. Mahonia Ltd. & Mahonia Nat. Gas* v. *Liberty Mut. Ins. Co.*, 189 F. Supp. 2d 20, 23 (S.D.N.Y. 2002) ("[W]here … there is in effect concurrent representation of two adverse clients, the potential for conflict is hardly limited to the trial context but can infect, actually or potentially, a broad spectrum of activities[.]"); *see Pfizer* v. *Stryker Corp.*, 256 F. Supp. 2d 224, 227 n.11 (S.D.N.Y. 2003) (discussing *Mahonia* but distinguishing it on its facts).  Although intuitively appealing, this view appears to be idiosyncratic in the Second Circuit.  Courts have cast "trial taint" as a factor relevant to assessing whether either type of attorney conflict — concurrent or successive — merits disqualification.  *See, e.g.*, *Glueck* v. *Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981); *Rothberg* v. *Phil's Main Roofing, LLC*, No. 14 Civ. 10195 (NSR), 2016 WL 2344882, at *2 (S.D.N.Y. May 2, 2016); *CQS ABS Master Fund Ltd.* v. *MBIA Inc.*, No. 12 Civ. 6840 (RJS), 2013 WL 3270322, at *8 (S.D.N.Y. June 24, 2013); *Cohen* v. *Strouch*, No. 10 Civ. 7828 (DLC), 2011 WL 1143067, at *2 (S.D.N.Y. Mar. 24, 2011).

2016 WL 2344882, at *2 (S.D.N.Y. May 2, 2016) (quoting *Bangkok Crafts Corp.*
v. *Capitolo di San Pietro in Vaticano*, 376 F. Supp. 2d 426, 428 (S.D.N.Y. 2005)).

Local rules of professional conduct also play a limited role in the
attorney-disqualification calculus.  "Federal courts adjudicating questions
involving the ethics of attorneys," including questions concerning
disqualification, "look to the local rules of professional conduct for guidance."
*AVRA Surgical, Inc.* v. *Dualis MedTech GmbH*, No. 13 Civ. 7863 (DLC), 2014 WL
2198598, at *2 (S.D.N.Y. May 27, 2014).  But rules of professional conduct
"merely provide" just that: "general guidance."  *Hempstead*, 409 F.3d at 132.
And in turn, "not every violation of a disciplinary rule will necessarily lead to
disqualification."  *Id.*; *accord GSI*, 618 F.3d at 209; *see also Rothberg*, 2016 WL
2344882, at *2 ("Recognizing the serious impact of attorney disqualification on
the client's right to select counsel of his choice, [the Second Circuit has]
indicated that such relief should ordinarily be granted only when a violation of
the Canons of the Code of Professional Responsibility poses a significant risk of
trial taint." (quoting *Glueck* v. *Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir.
1981))).[8]

---

[8]     As of April 1, 2009, New York courts have followed the New York Rules of Professional
Conduct, not the Canons of the Code of Professional Responsibility.  *See* N.Y. R. Prof'l
Conduct Refs. & Annos.  But "[c]ase authority interpreting the old canons continues to
be probative on issues that are analyzed under the new rules, especially where … the
new rule generally incorporates the substance of the old canons."  *Gurvey* v. *Cowan,
Liebowitz & Latman, P.C.*, No. 06 Civ. 1202 (LGS) (HBP), 2014 WL 6491281, at *4 n.6
(S.D.N.Y. Nov. 20, 2014) (quoting *Finkel* v. *Frattarelli Bros.,* 740 F. Supp. 2d 368, 372
n.1 (E.D.N.Y. 2010)).  Such is the case here.  For example, the Second Circuit's
canonical concurrent-representation case — *Cinema 5, Ltd.* v. *Cinerama, Inc.*, 528 F.2d
1384 (2d Cir. 1976) — analyzed this type of conflict under then-governing Canon 5.  *Id.*
at 1386-87.  And "Canon 5 … is substantially similar to … Rule 1.7 of the New York
Rules of Professional Conduct," which the Court cites throughout this Opinion.  *All Star
Carts & Vehicles, Inc.* v. *BFI Canada Income Fund*, No. 08 Civ. 1816 (AKT), 2010 WL

All this should make plain that a party seeking to disqualify an attorney faces a difficult task.  "Nonetheless, 'any doubt is to be resolved in favor of disqualification.'"  *John Wiley & Sons, Inc.* v. *Book Dog Books, LLC*, 126 F. Supp. 3d 413, 419 (S.D.N.Y. 2015) (quoting *Hull* v. *Celanese Corp.,* 513 F.2d 568, 571 (2d Cir. 1975)).

## B.  Plaintiff's Motion to Disqualify ALB

This has been an uncommonly hard-fought case.  Even a cursory review of the docket confirms that the relationship between Plaintiff's counsel and ALB has been acrimonious.  And the Court cannot escape the conclusion that at least part of Plaintiff's motivation in moving to disqualify ALB (and perhaps the DE Defendants' motivation in joining that motion) is tactical.  Given the duration of this litigation and the fact that there are pending cross-motions for summary judgment, the Court recognizes that disqualifying ALB will further complicate what is already a complicated case.

That said, ALB suffers from a disqualifying conflict of interest.  Second Circuit Law and New York's Rules of Professional Conduct point in the same direction:  ALB's decision to sue DE in state court disqualifies it from representing any defendant in the Federal Action.

The Court's resolution of Plaintiff's disqualification motion, however, is complicated by the fact that the parties' briefs largely talk past each other.

---

2243351, at *3 (E.D.N.Y. June 1, 2010); *see also Papanicolaou* v. *Chase Manhattan Bank, N.A.*, 720 F. Supp. 1080, 1083 n.5 (S.D.N.Y. 1989) ("Canon 5 has been reconstituted as Rule 1.7.").  Indeed, *Cinema 5* is still cited approvingly by the Second Circuit.  *See, e.g.*, *GSI*, 618 F.3d at 209-10.

Plaintiff and the DE Defendants argue correctly that ALB suffers from a concurrent-representation conflict of interest.  ALB appears to concede this in a declaration accompanying its motion to withdraw as the DE Defendants' counsel, where it states that New York Rule of Professional Conduct 1.7 forbids it from continuing that representation.  (Dkt. #216-1, ¶ 16).  However, in their opposition brief, the Turin Defendants have responded to Plaintiff's motion under the apparent belief that ALB suffers from a *successive*-representation conflict of interest.  In turn, the Turin Defendants have addressed very few of the factors this Court must consider to determine whether ALB can remain as their counsel.

Nonetheless, in this Opinion the Court will endeavor to undertake a wholesale, probing analysis of Plaintiff's disqualification motion.  That analysis proceeds in three steps.  First, the Court will explain why ALB suffers from a conflict of concurrent, not successive, representation, which conflict renders its representation of the Turin Defendants and the DE Defendants "prima facie improper."  *E.g.*, *GSI*, 618 F.3d at 209 (quoting *Cinema 5, Ltd.* v. *Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976)).  Second, the Court will address why the JDA does not cure ALB's conflict.  And finally, the Court will analyze why ALB has not, and cannot, overcome Plaintiff's prima facie case for disqualification.

## 1.   ALB's Concurrent Representation of the Turin Defendants and the DE Defendants Is Prima Facie Improper

The first step in deciding this Opinion is definitional:  What is the *type* of conflict from which ALB suffers?  Without addressing the distinction between concurrent- and successive-representation conflicts, the Turin Defendants'

24

brief relies heavily on case law considering the disqualifying effect of successive adverse representations.  (*See* Turin Opp. 5-11).  But Second Circuit precedent makes plain that ALB's conflict is one of concurrent, not successive, representation.  And as the Court will explain, that conflict renders ALB's representation of the DE Defendants *and* the Turin Defendants prima facie improper.

### a.   Applicable Law

"The standard for disqualification varies depending on whether the representation is concurrent or successive."  *Hempstead*, 409 F.3d at 133.  Understanding these two standards turns on two questions.  First, at what point in a case should a court assess whether an attorney's conflict is successive or concurrent?  Second, how do these two standards differ?  Ample precedent supplies clear answers to both questions.

First, the temporal component:  To determine the nature of an attorney's conflict of interest, a court should look to "[t]he status of the [attorney's] relationship" with his client "at the time that the conflict arises."  *Merck Eprova AG* v. *ProThera, Inc.*, 670 F. Supp. 2d 201, 209 (S.D.N.Y. 2009) (quoting *Anderson* v. *Nassau Cty. Dep't of Corrs.,* 376 F. Supp. 2d 294, 298-99 (E.D.N.Y. 2005)).  "And, indeed, where counsel have simultaneously represented clients with differing interests, the standard for concurrent representation applies even if the representation ceases prior to the filing of a disqualification motion."  *Id.*  This approach "prevent[s] attorneys from manipulating their commitments 'merely by firing the disfavored client, dropping the client like a hot potato, and

transforming a continuing relationship to a former relationship by way of client abandonment[.]'" *CQS ABS Master Fund Ltd.* v. *MBIA Inc.*, No. 12 Civ. 6840 (RJS), 2013 WL 3270322, at *9 n.5 (S.D.N.Y. June 24, 2013) (internal quotation marks omitted) (quoting *Universal City Studios, Inc.* v. *Reimerdes,* 98 F. Supp. 2d 449, 453 (S.D.N.Y. 2000)).

This approach also reflects a significant difference in the standards courts apply to assess successive, versus concurrent, conflicts of interest. Courts in this Circuit follow a three-part test to determine whether an attorney should be disqualified for taking on successive adverse representations — such a conflict "may" disqualify an attorney if:

> [i] [T]he moving party is a former client of the adverse party's counsel; [ii] there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and [iii] the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Hempstead*, 409 F.3d at 133 (quoting *Evans* v. *Artek Sys. Corp.,* 715 F.2d 788, 791 (2d Cir. 1983)).

In contrast, concurrently representing adverse parties "is 'prima facie improper.'" *GSI*, 618 F.3d at 209 (quoting *Cinema 5*, 528 F.2d at 1387). Importantly, a court will consider an attorney who "represents two clients with adverse interests in the same matter, albeit in different courts," to be concurrently representing those clients. *Strouch*, 2011 WL 1143067, at *5; *see also Pergament* v. *Ladak*, No. 11 Civ. 2797 (MDG), 2013 WL 3810188, at *6

26

(E.D.N.Y. July 23, 2013) ("A conflict due to concurrent representation can … occur where an attorney represents clients in two separate actions."). To rebut a prima facie disqualification case, "it is incumbent upon the attorney to 'show, at the very least, that there will be no actual or *apparent* conflict in loyalties or diminution in the vigor of his representation.'" *GSI*, 618 F.3d at 209 (quoting *Cinema 5*, 528 F.2d at 1387). In other words, this Circuit's "per se[] rule" against concurrent adverse representations "shifts the burden to the attorney opposing disqualification." *Brown & Williamson Tobacco Corp.* v. *Pataki*, 152 F. Supp. 2d 276, 281 (S.D.N.Y. 2001). And "this is 'a burden so heavy that it will rarely be met.'" *GSI*, 618 F.3d at 209 (quoting *Glueck*, 653 F.2d at 749).

### b.    Analysis

Defining the nature of ALB's conflict of interest turns, in the first instance, on whether that conflict is concurrent or successive. Explaining why that conflict prima facie disqualifies ALB from representing both the DE Defendants *and* the Turin Defendants requires the Court to consider the nature of the adversity between these two groups of defendants.

To start, ALB's conflict is one of concurrent, not successive, representation. On July 21, 2016, ALB filed the State-Court Complaint against DE. On that date, ALB represented both the Turin Defendants and the DE Defendants in the Federal Action. In other words, ALB concurrently represented a party — DE — that it sued in a related state-court case. And

27

ALB sued DE on behalf of another party — Turin — that it *also* represented in both the Federal Action and the State-Court Action.

That ALB no longer represents the DE Defendants is of no moment.  This Court is concerned with ALB's conflict "at the time that [it] … ar[ose]." *ProThera, Inc.*, 670 F. Supp. 2d at 209 (internal quotation mark and citation omitted).  And at the latest, ALB's conflict arose when it filed the State-Court Complaint: July 21, 2016, a date on which ALB represented all defendants in the Federal Action.

ALB's decision to sue DE makes plain that its representation of the *DE Defendants* in the Federal Action is prima facie improper.  ALB cannot simultaneously represent and sue the same party, even in two separate cases.  But this Court has no need to disqualify ALB from representing the DE Defendants:  They have already retained new counsel.  A better question is why ALB's act of filing the State-Court Complaint against DE makes its representation of the *Turin* Defendants prima facie improper.

The answer lies in the adversity of interests between the Turin Defendants and the DE Defendants in the Federal Action.  Although ALB sued DE in state court, many of the State-Court Complaint's allegations arise directly out of the Federal Action.  In particular, Turin there alleges that DE's negligence — in failing to procure adequate insurance and in managing the Property — has forced Turin to pay out-of-pocket legal costs, and may force it to shoulder a judgment, in the Federal Action.

28

These claims from Turin's State-Court Complaint are in substance, if not form, cross-claims related to the Federal Action. They "arise[] out of the" Federal Action, *and* they "relate[] to [the] property that is the subject matter of the [Federal Action]." Fed. R. Civ. P. 13(g). And the State-Court Complaint alleges that DE is "liable to [Turin] for all or part of [the] claim[s]" that Plaintiff has asserted against the Turin Defendants. (*Id.*). To be sure, the mere "existence of potential cross-claims" does not automatically prohibit an attorney from jointly representing two parties. *See, e.g.*, *Muniz*, 2017 WL 238482, at *6 (collecting cases). But "no one could conscionably contend that" an attorney may "simultaneously represent both the cross claim plaintiff[] and the cross claim defendant[] in" a single action. *Rice* v. *Baron*, 456 F. Supp. 1361, 1374 (S.D.N.Y. 1978) (internal quotation marks and citation omitted). So too here. Turin may have chosen to litigate its suit against DE in a different forum. But the basis of that suit concerns this Federal Action. And Turin's decision to pursue that suit against DE renders the parties' relationship in the Federal Action adverse.

New York Rule of Professional Conduct 1.7, which governs concurrent-representation conflicts, helps explain why this is so. Under Rule 1.7(a), "a lawyer shall not represent a client if a reasonable lawyer would conclude that … the representation will involve the lawyer in representing differing interests[.]" N.Y. R. Prof'l Conduct 1.7(a). And Comment Eight to Rule 1.7 defines "differing interests" as follows:  "Differing interests exist if there is a significant risk that a lawyer's exercise of professional judgment in considering,

recommending or carrying out an appropriate course of action for the client will be adversely affected or the representation would otherwise be materially limited by the lawyer's other responsibilities or interests." *Id.* cmt. 8.

For much of ALB's joint representation of the Turin Defendants and the DE Defendants, those defendants' interests were aligned. They jointly denied all of the claims in the FAC. And they jointly sought summary judgment dismissing all of those claims. But this alignment of interests ended when Turin filed the State-Court Complaint. At that point, it was in the Turin Defendants' interest for this Court to find that DE negligently mismanaged the Property.

The Court has considered what could result if, in the process of granting Plaintiff's motion for summary judgment, the Court determined that DE negligently violated HUD regulations. If the New York court adjudicating the State-Court Complaint gave preclusive effect to that determination, Turin would be well on its way to recovering (from DE) its legal costs from the Federal Action and obtaining (from DE) indemnity against a judgment in the Federal Action.

The JDA raises a related concern. Under the JDA, Turin agreed to pay the legal costs of the Turin Defendants and the DE Defendants. (Geller Decl., Ex. 1, ¶ 1). But Turin also agreed that it would *not* cover the DE Defendants' legal costs "if it is determined, after the exhaustion of all appellate rights, that the DE Defendants acted in a grossly negligent manner or perpetrated willful misconduct with respect to the issues raised in the" Federal Action. (*Id.* at ¶ 2).

These are the very allegations Turin brings against DE in the State-Court Complaint.  While the Court imagines that Turin would prefer to succeed in the Federal Action, the fact remains that Turin has a significant financial incentive to ensure that DE *loses* in the Federal Action and the State-Court Action.  And at the time this incentive materialized — the date Turin filed the State-Court Complaint — ALB represented both Turin and DE.

The consequence of these differing interests is clear:  ALB concurrently represented two adverse parties in the Federal Action.  On the date that ALB's conflict of interest arose, July 21, 2016, ALB simultaneously represented two clients, Turin and DE, whose interests in the Federal Action were opposed.  Thus, like its representation of the DE Defendants, ALB's representation of the Turin Defendants is prima facie improper.

### 2.    The JDA Does Not Cure ALB's Concurrent-Representation Conflict

The Turin Defendants resist Plaintiff's disqualification motion by relying heavily on the JDA between and among Schneider Mitola, Turin, and the DE Defendants.  There, the Turin Defendants argue, the DE Defendants waived their right to object to ALB suing DE while simultaneously representing Turin.

The Court disagrees.  The Turin Defendants' reliance on the JDA has many pitfalls — chief among them, that ALB was not a party to that agreement.  But in any case, the JDA does not confirm that the DE Defendants knowingly waived or cured ALB's conflict through informed consent.  In turn, the JDA does not diminish Plaintiff's prima facie case for disqualifying ALB.

### a.   Applicable Law

Assessing the JDA's effect on ALB's conflict of interest requires the Court to answer two questions.  First, what principles of law govern the Court's reading of the JDA?  Second, what effect does a valid conflicts waiver have on an attorney's concurrent representation of two adverse clients?

This first question is straightforward.  The JDA is a contract, and this Court should apply standard principles of contract interpretation when reading it.  *See GSI*, 618 F.3d at 209, 213-14.  Thus, the Court's "construction" of the JDA "is a question of law unless the agreement's meaning is ambiguous."  *Id.* at 209.  And "[a]n agreement is ambiguous only if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire … agreement.'"  *Id.* (quoting *Walk–In Med. Ctrs., Inc.* v. *Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir. 1987)).

Second, in many instances, clients can waive or cure their attorney's concurrent-representation conflicts by giving informed written consent.  *See HLP Props.*, 2014 WL 5285926, at *3 ("In many cases [of concurrent adverse representation], such a conflict can be cured by written consent from all affected parties."); *Lee* v. *Charles*, No. 12 Civ. 7374 (JFK), 2013 WL 5637658, at *2 (S.D.N.Y. Oct. 16, 2013) ("Where a concurrent conflict of interest exists, the attorney should disclose the conflict to the clients and obtain their informed written consent before the representation begins.").

Comment 18 to New York Rule of Professional Conduct 1.7 defines "informed consent," in relevant part, as follows:

> Informed consent requires that each affected client be aware of the relevant circumstances, including the material and reasonably foreseeable ways that the conflict could adversely affect the interests of that client. … When representation of multiple clients in a single matter is undertaken, the information must include the implications of the common representation, including possible effects on loyalty, confidentiality and the attorney-client privilege, and the advantages and risks involved.

N.Y. R. Prof'l Conduct 1.7 cmt. 18.

But in New York, informed written consent, standing alone, does not cure an attorney's concurrent-representation conflict of interest:

> Even when "both affected clients have provided affidavits stating that each has been fully informed by counsel of the implications of the simultaneous representation, and each consents," New York law "also requires a belief under a reasonable lawyer standard … that the attorney will be able to provide competent and diligent representation to each affected client."

*Strouch*, 2011 WL 1143067, at *5 (quoting *Paladino* v. *Skate Safe, Inc.*, 958 N.Y.S.2d 62 (Table), 2010 WL 3359550, at *2 (Sup. Ct. Aug. 16, 2010)); *accord Almonte* v. *City of Long Beach*, No. 04 Civ. 4192 (JO), 2007 WL 951863, at *5 (E.D.N.Y. Mar. 27, 2007) ("Clients may waive the conflicts of interest that arise from concurrent representation by giving informed consent to the ongoing representation, if a disinterested lawyer would perceive no impairment of professional judgment stemming from the joint representation."); *see also* N.Y. R. Prof'l Conduct 1.7(a) ("[A] lawyer shall not represent a client if a *reasonable lawyer* would conclude that … the representation will involve the lawyer in representing differing interests[.]" (emphasis added)).  And "[w]hen one party's

33

interest could adversely affect the other, a court may conclude that 'such a belief would not be reasonable.'" *Strouch*, 2011 WL 1143067, at *5 (quoting *Paladino*, 2010 WL 3359550, at *3).  Put another way:  "[C]lient consent that is given is not valid if the objective test of a disinterested lawyer is not met." *Id.* (quoting *Shaikh ex rel. Shaikh* v. *Waiters*, 710 N.Y.S.2d 873, 876 (Sup. Ct. 2000)).

New York Rule of Professional Conduct 1.7(b) reflects the view that an attorney who wishes to represent concurrently two adverse parties needs more than those parties' informed consent.  It provides:

> Notwithstanding the existence of a concurrent conflict of interest …, a lawyer may represent a client if:
>
> [i] the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>
> [ii] the representation is not prohibited by law;
>
> [iii] the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
>
> [iv] each affected client gives informed consent, confirmed in writing.

N.Y. R. Prof'l Conduct 1.7(b); *see Kriss* v. *Bayrock Grp. LLC*, No. 10 Civ. 3959 (FM), 2014 WL 2212063, at *8 (S.D.N.Y. May 29, 2014) (characterizing Rule 1.7(b) as setting forth "an exception to th[e] rule" that "[a]bsent consent, an attorney ordinarily may not simultaneously represent parties whose interests are materially adverse").

To be sure, some conflicts of interest are "non-waivable." *Strouch*, 2011 WL 1143067, at \*5.  Rule 1.7(b) reflects this:  It states that a lawyer may concurrently represent adverse clients only if "the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal."  N.Y. R. Prof'l Conduct 1.7(b)(iii); *see Strouch*, 2011 WL 1143067, at \*5 (drawing same conclusion from Rule 1.7(b)); *Big Brows LLC* v. *Devitt*, 936 N.Y.S.2d 57 (Table), 2011 WL 3557061, at \*2-3 (Sup. Ct. Aug. 12, 2011) (disqualifying attorney from jointly representing two plaintiffs despite attorney's avowed compliance with Rule 1.7(b), where defendant raised counterclaim seeking contribution that would "necessarily require[] plaintiffs … to defend themselves against their fellow plaintiffs' claims," and noting that plaintiffs' conflicting "pecuniary interests" created an "irreconcilable conflict in the professional allegiance of counsel" that could not "be waived").  But to the extent that a concurrent-representation conflict *is* waivable, an attorney must do more than obtain every affected client's informed consent before taking on that representation.

### b.   Analysis

The Turin Defendants argue that two types of provisions in the JDA allow ALB to remain as their counsel.  First, they contend that the JDA's conflicts waiver prevents the DE Defendants from moving to disqualify ALB.  Second, they argue that because the JDA expressly contemplated that Turin and the DE Defendants would exchange confidential information, the DE Defendants

cannot now cry foul at the prospect of ALB sharing their confidential information with the Turin Defendants.

Both of these arguments fail.  To the extent the JDA governs ALB's relationship with the Turin Defendants and the DE Defendants — and the Court harbors serious doubts that it does — nothing in the JDA suggests that the DE Defendants waived their right to object to the concurrent-representation conflict from which ALB now suffers.  And the Turin Defendants' argument concerning confidential information is inapposite, because it relies on law interpreting successive-representation conflicts.  In turn, the JDA does not cure ALB's conflict of interest.

> ### i. The JDA's Conflicts Waiver, to the Extent It Still Applies, Does Not Cure ALB's Concurrent-Representation Conflict of Interest

Before considering the effect of the JDA's conflicts waiver, the Court addresses two major gaps in the Turin Defendants' brief.  Even overlooking these gaps, the Court concludes that the JDA unambiguously does not cure ALB's conflict of interest.

First, the Turin Defendants have not established that the JDA governs ALB's attorney-client relationship between the Turin Defendants and the DE Defendants.  *Schneider Mitola* signed the JDA; ALB did not.  The Turin Defendants contend that after ALB entered this case, "the DE Defendants continued to litigate under the JDA without comment or objection."  (Turin Opp. 4).  They then claim, without citing to any legal authority, that "the provisions of the JDA with respect to the parties['] predecessor counsel,

[Schneider Mitola], should be equally applicable to their current representation by [ALB]." (*Id.*).

The closest legal analogue to the Turin Defendants' argument would be a claim that ALB, the Turin Defendants, and the DE Defendants entered into a novation once ALB replaced Schneider Mitola.  But that claim would fail.  "New York courts have set a stringent standard for novation." *Ruso* v. *Morrison*, 695 F. Supp. 2d 33, 53 (S.D.N.Y. 2010) (quoting *Abuelhija* v. *Chappelle,* No. 08 Civ. 3679 (HB), 2009 WL 1883787, at *6 (S.D.N.Y. June 29, 2009)).  "Under New York law, in order to establish a novation, 'four elements must be present: [i] a previously valid obligation; [ii] agreement of all parties to a new contract; [iii] extinguishment of the old contract; and [iv] a valid new contract.'" *Long Side Ventures, LLC* v. *Adarna Energy Corp.*, No. 12 Civ. 6836 (LTS), 2014 WL 4746026, at *4 (S.D.N.Y. Sept. 24, 2014) (quoting *In re Balfour MacLaine Intern. Ltd.,* 85 F.3d 68, 82-83 (2d Cir. 1996)).  True, "[c]onsent to a novation need not be express but may be implied from all the facts and circumstances." *Trans-Orient Marine Corp.* v. *Star Trading & Marine, Inc.,* 736 F. Supp. 1281, 1283 (S.D.N.Y. 1990).  But apart from their conclusory claim that the DE Defendants did not "comment or object[]" to the JDA after ALB began representing them, the Turin Defendants have introduced no evidence suggesting that the parties agreed to, let alone entered into, a new JDA.  In turn, the Turin Defendants have given the Court no reason to conclude that the JDA continued in force after ALB replaced Schneider Mitola.

Assuming that the JDA governed *ALB*'s relationship with the DE Defendants and the Turin Defendants, the Turin Defendants also have not established that ALB's conflict is waivable.  Rule 1.7(b) forbids an attorney from representing two clients if one of those clients "assert[s] … a claim" against the other "in the same litigation or other proceeding before a tribunal."  N.Y. R. Prof'l Conduct 1.7(b)(iii).  Strictly speaking, ALB has not run afoul of this rule: It has not asserted, in the Federal Action, a claim against the DE Defendants on the Turin Defendants' behalf.  But in substance, that is precisely what ALB has done, "albeit in [a] different court[]."  *Strouch*, 2011 WL 1143067, at *5.  And more to the point, on the date ALB filed the State-Court Complaint, it represented two groups of defendants in the Federal Action, the DE Defendants and the Turin Defendants, whose "pecuniary interests" were opposed.  *Devitt*, 2011 WL 3557061, at *3.  This all suggests that the DE Defendants *could not consent* to ALB's current conflict, which arose after ALB sued its own client.

And even if the Court were to overlook these deficiencies in the Turin Defendants' brief, the crux of their argument fails:  The JDA does not cure ALB's conflict of interest.  The JDA's conflicts waiver begins:

> In the event of any litigation or other dispute between or among the Parties, each Party hereby waives any claim that counsel for any other Party is or should be disqualified from representing any other Party *by reason of receipt of confidential, privileged or protected information or documents* pursuant to this Agreement or any work performed or representation in furtherance of this Agreement.

38

(Geller Decl., Ex. 1, ¶ 5 (emphasis added)).  That provision is not ambiguous.
Pursuant to the JDA's conflicts waiver, the DE Defendants waived their right to
object to Schneider Mitola's (or perhaps ALB's) representation on the grounds
that it had received confidential information.  But this consideration — an
attorney's possession of a client's confidential information — is a factor courts
consider when assessing the propriety of *successive* representations of adverse
clients.  *See, e.g., Hempstead*, 409 F.3d at 133; *see also Glueck*, 653 F.3d at
748 (drawing distinction between cases such as *Cinema 5* in which "an
attorney represents one client in a suit against another," and those cases
where an attorney "might benefit a client in a lawsuit by using confidential
information about an adverse party obtained through prior representation of
that party"); *Nyquist*, 590 F.2d at 1246 (same).

In contrast, whether an attorney may *concurrently* represent adverse
clients turns on whether he can demonstrate "at the very least, that there will
be no actual or *apparent* conflict in loyalties or diminution in the vigor of his
representation."  *GSI*, 618 F.3d at 209 (quoting *Cinema 5*, 528 F.2d at 1387).
And by the JDA's terms, the DE Defendants did not waive their right to argue
that Schneider Mitola (or perhaps ALB) should be disqualified on the basis of
these concerns.

Put simply, the DE Defendants waived their right to object if Schneider
Mitola sued them in a matter subsequent to the Federal Action (at least on the
basis that Schneider Mitola possessed the DE Defendants' confidential

information).  The DE Defendants did not waive their right to object if Schneider Mitola concurrently sued and represented them.

Other parts of the JDA underscore this conclusion.  A sub-paragraph of the JDA's conflicts waiver provides that if "an actual non-waivable conflict ar[o]se," Schneider Mitola would continue representing every defendant in the Federal Action except the DE Defendants.  (Geller Decl., Ex. 1, ¶ 5(c)).  The Turin Defendants urge this Court to give effect to this "valid waiver" and allow ALB to remain as their counsel.  (Turin Opp. 11).  In order to endorse that view, the Court would need to conclude that the "actual non-waivable conflict" to which the JDA refers encompasses ALB's conflict: suing its own client.  But the sub-paragraph of the JDA that immediately follows this "actual non-waivable conflict" clause confirms that Schneider Mitola *never* intended to follow that course of action:

> It is further agreed by the Parties that, with respect to any issue that may arise in the [Federal Action] which you disagree and/or which one of you may wish to pursue a course that benefits one but is detrimental to the interest of the other, [Schneider Mitola] cannot advise or assist any of you in pursuing such course and cannot advocate for any Parties' separate interest at the expense of the other Parties as long as [Schneider Mitola] is representing you.

(Geller Decl., Ex. 1, ¶ 5(d)).  This provision explicitly exempts ALB's current conflict of interest from the universe of "actual non-waivable conflict[s]" referenced in the JDA.  Schneider Mitola pledged that it would not assert a claim that was adverse to either the Turin Defendants' or the DE Defendants' interests.  ALB, however, did just that.

40

The Turin Defendants cite a number of federal and New York state-court cases wherein courts enforced waiver agreements that the Turin Defendants claim are similar to the JDA's.  (Turin Opp. 9-10).  As the DE Defendants note in their brief, all of these cases concerned *successive*-representation conflicts of interest.  (DE Br. 7).  *See Estate of Hogarth* v. *Edgar Rice Burroughs, Inc.*, No. 00 Civ. 9569 (DLC), 2001 WL 515205, at *5-6 (S.D.N.Y. May 15, 2001); *GEM Holdco, LLC* v. *Changing World Techs., L.P.*, 7 N.Y.S.3d 242 (Table), 2015 WL 120843, at *4 (Sup. Ct.), *aff'd in part, appeal dismissed in part sub nom. Gem Holdco, LLC* v. *Ridgeline Energy Servs., Inc.*, 14 N.Y.S.3d 14 (1st Dep't 2015); *Grovick Properties, LLC* v. *83-10 Astoria Boulevard, LLC*, 990 N.Y.S.2d 601, 603-04 (2d Dep't 2014); *St. Barnabas Hosp.* v. *N.Y. City Health & Hosps. Corp.*, 775 N.Y.S.2d 9, 10-11 (1st Dep't 2004).  And more importantly, the Turin Defendants have not explained why this Court should read into the JDA's conflicts waiver a class of conflicts — concurrent-representation conflicts — that the waiver expressly exempts.

The upshot of the Court's textual analysis is this:  Even assuming that (i) the JDA survived Schneider Mitola's departure and (ii) ALB's conflict is waivable, ALB did not obtain the DE Defendants' informed consent before filing the State-Court Complaint.  That is because nothing in the JDA addresses the concurrent-representation conflict from which ALB suffers.  To be sure, even if the DE Defendants had consented to this conflict, the Court would still have good reason to disqualify ALB.  It is unlikely that "a reasonable lawyer" would believe that ALB could (i) defend the Turin Defendants and the DE Defendants

41

in the Federal Action while (ii) suing DE on Turin's behalf in the State-Court Action. *Strouch*, 2011 WL 1143067, at *5 (quoting *Paladino*, 2010 WL 3359550, at *2). But the Court need not reach this issue. The JDA unambiguously does *not* cure ALB's concurrent-representation conflict of interest.

### ii. The Turin Defendants' Arguments Concerning the JDA's Confidentiality Provisions Are Inapposite

The Court's conclusion that the JDA's conflicts waiver does not cure ALB's conflict should end its analysis of the JDA. But for the sake of thoroughness, the Court will also address the Turin Defendants' arguments about the JDA's confidentiality provisions. Those arguments are predicated on the Turin Defendants' incorrect assumption that ALB suffers from a successive-representation conflict of interest. They are thus inapposite.

By the Turin Defendants' reading of the JDA, "the DE Defendants could have [had] no expectation that any information they provided in the litigation would be kept confidential from the Turin Defendants." (Turin Opp. 8). Thus, they claim, the DE Defendants cannot state a claim for disqualification under *Allegaert* v. *Perot*, 565 F.2d 246 (2d Cir. 1977). (Turin Opp. 8; *see also id.* at 1-2, 5-6 (citing *Allegaert*)).

The problem for the Turin Defendants is that *Allegaert* considered a successive-representation conflict. *Allegaert*, 565 F.2d at 250. Indeed, the Turin Defendants' brief includes a lengthy block quotation from *Allegaert* that cites to Canon 4 of the Code of Professional Responsibility, which dealt with

successive, not concurrent, adverse representations. *Glueck*, 653 F.2d at 748; *see Wai Hoe Liew* v. *Cohen & Slamowitz, LLP*, No. 14 Civ. 4868 (KAM) (MDG), 2015 WL 5579876, at *9 (E.D.N.Y. Sept. 22, 2015) ("[T]he rule against successive representation [w]as codified … previously as Canon 4[.]").  Here too, the Turin Defendants have misconstrued the nature of ALB's conflict.  And here again, they have given the Court no reason to conclude that ALB should not be disqualified.

### 3. ALB Has Not Carried Its "Heavy" Burden of Rebutting Plaintiff's Prima Facie Case for Disqualification

#### a. Applicable Law

This Court has already concluded that ALB's representation of the Turin Defendants "is 'prima facie improper.'"  *GSI*, 618 F.3d at 209 (quoting *Cinema 5*, 528 F.2d at 1387).  To rebut Plaintiff's prima facie case, ALB must demonstrate, "at the very least, that there will be no actual or *apparent* conflict in loyalties or diminution in the vigor of [its] representation."  *Strouch*, 2011 WL 1143067, at *5 (citation omitted).  "[T]his is 'a burden so heavy that it will rarely be met.'"  *GSI*, 618 F.3d at 209 (quoting *Glueck*, 653 F.2d at 749).

Further, in resolving Plaintiff's motion for disqualification, this Court is mindful that "[d]isqualification is only warranted in the rare circumstance where an attorney's conduct 'poses a significant risk of trial taint.'"  *Book Dog Books*, 126 F. Supp. 3d at 419 (quoting *Decker* v. *Nagel Rice LLC,* 716 F. Supp. 2d 228, 231 (S.D.N.Y. 2010)).  The Court notes that in many cases, courts appear to assume that a concurrent adverse representation *itself* "poses a significant risk of trial taint."  *See, e.g.*, *Glueck*, 653 F.2d at 748; *BT Holdings,*

2015 WL 8968360, at *3 ("A significant risk of trial taint is encountered when an attorney represents one client in a suit against another client[.]" (internal quotation mark omitted) (quoting *Glueck*, 653 F.2d at 748)); *cf. Pfizer* v. *Stryker Corp.*, 256 F. Supp. 2d 224, 227 (S.D.N.Y. 2003) ("[A] risk of trial taint inheres in circumstances that could impair the ability of the court to reach a fair and just result as, for example, impairment of the attorney's incentive to act vigorously on behalf of the client[.]" (citing *Glueck*, 653 F.2d at 750)).

And given the history of this case, the Court also thinks it prudent "to consider any tactical motivations" Plaintiff may have for moving to disqualify ALB, as well as "the prejudice that [the Turin Defendants] may suffer in the event" that [ALB] "is disqualified." *HLP Props.*, 2014 WL 5285926, at *5.

### b. Analysis

By failing to define correctly the nature of ALB's conflict, the Turin Defendants have not addressed whether ALB can carry its near-insurmountable burden of rebutting Plaintiff's prima facie case for disqualification. Nevertheless, the Court is confident that ALB could not make this showing. The Court is equally confident that ALB's concurrent representation of the Turin Defendants poses a severe risk of trial taint. And because the extent of ALB's conflict outweighs any prejudice to the Turin Defendants, the Court must disqualify ALB in spite of Plaintiff's potential tactical motivations for bringing this motion.

The Court begins with the *Cinema 5* factors, mindful that it is assessing ALB's conflict at the time it arose. There can be no question that on July 21,

44

2016, ALB *at minimum* suffered from an "apparent conflict in loyalties." *Cinema 5*, 528 F.2d at 1387. In the State-Court Complaint, Turin announced its intention to seek damages and indemnity from DE for its alleged negligence — including its negligence in managing the Property. And if this Court were to find that DE was negligent, that would appear to be a boon for Turin in the State-Court Action. Put simply, the Turin Defendants' and the DE Defendants' interests diverged sharply with the filing of the State-Court Complaint. By playing both sides of this schism, ALB inserted itself in the middle of an irreconcilable conflict of interest.

For similar reasons, the Court concludes that ALB's representation of the Turin Defendants poses a significant risk of trial taint (or would have posed such a risk, prior to ALB's withdrawal). It would seem that this conclusion flows naturally from the former: ALB's concurrent representation of the Turin Defendants and the DE Defendants, whose interests have in large part become opposed, is an untenable conflict. To the extent that "trial taint" is a standalone component of a claim for disqualification, the Court concludes that it is satisfied amply here. The Turin Defendants now have a major financial incentive to ensure that this Court finds that the DE Defendants acted negligently. In other words, the Turin Defendants may conceivably wish for at least part of Plaintiff's lawsuit to succeed. Allowing ALB to represent both groups of defendants would imperil any defense the DE Defendants might hope to mount. That is an eventuality this Court cannot entertain.

Turning to Plaintiff's motivations for bringing this motion, the Court has little trouble concluding that they are at least in part tactical. This case is at the summary-judgment stage, and the parties' road here has been a contentious one. Surely, Plaintiff is motivated at least partially by the prospect of dealing the Turin Defendants a setback. And indeed, the Court recognizes that granting Plaintiff's motion will likely prejudice the Turin Defendants, who will need to find new counsel after ALB has led them through discovery and dispositive motions.

But the ethical quagmire in which ALB finds itself is too dire to ignore, and attributable in significant measure to decisions by ALB. ALB entered this case, officially, in May 2014. At no time thereafter did it execute its own joint defense agreement with the two groups of defendants it elected to represent. At no time did it attempt to revivify those defendants' existing JDA. Less than a month after filing its final summary-judgment brief, ALB initiated a lawsuit against one of its clients, DE, on behalf of another, Turin. It filed the State-Court Complaint, which at least intimated that DE had committed the misconduct Plaintiff alleged in his FAC. And ALB did not move to withdraw as the DE Defendants' counsel until one month *after* Plaintiff filed his disqualification motion.

Before the Court is an attorney-client conflict that Second Circuit law and New York's Rules of Professional Conduct unquestionably deem disqualifying. That conflict has vitiated the Court's confidence in ALB's ability to represent faithfully, and competently, any defendant in this case.

46

## CONCLUSION

For the reasons set forth above, Plaintiff's motion to disqualify ALB is GRANTED.  The Turin Defendants are ORDERED to retain new counsel **on or before April 22, 2017**.  This case is STAYED pending the Turin Defendants' retention of new counsel.

There are a number of pending motions in this case.  (Dkt. #166, 183, 223).  Once the Turin Defendants retain new counsel, they are ORDERED to submit a letter explaining whether they intend to adopt, in whole or in part, the Turin Defendants' (i) motion for summary judgment (Dkt. #166); (ii) motion to exclude Plaintiff's expert, Andrew A. Beveridge (*id.*); and/or (iii) opposition to Plaintiff's request to supplement his summary-judgment submissions and conduct additional discovery (Dkt. #224)  This letter is due **on or before May 1, 2017**.

The Clerk of Court is ORDERED to terminate Docket Entries 208, 225, and 229.

SO ORDERED.

Dated:     March 22, 2017
           New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge

47